TRAVELERS INSURANCE
COMPANY, Petitioner,

v.

William A. SAVIO, Respondent.

No. 83SC316.

Supreme Court of Colorado,
En Banc.

Sept. 30, 1985.
Rehearings Denied Oct. 21, 1985.

Law Firm of Thomas J. de Marino, Thomas J. de Marino, James R. Florey, Jr., Denver, for petitioner.

Ranson, Thomas & Yukawa, Jon C. Thomas, Colorado Springs, for respondent.

Knapp, Lee & York, P.C., Robert A. Weinberger, Jon A. Pfeiffer, Denver, for amicus curiae Colorado Defense Lawyers Assn.

James L. Gilbert & Associates, P.C., James L. Gilbert, Richard P. Murphy, Arvada, for amicus curiae Colorado Trial Lawyers Assn.

KIRSHBAUM, Justice.

We granted certiorari to review the decision of the Court of Appeals in *Savio v. Travelers Insurance Co.*, 678 P.2d 549 (Colo.App.1983), which held that the Workmen's Compensation Act of Colorado (the Act) does not prohibit an employee from pursuing common law remedies against a workers compensation insurance carrier for bad faith in the processing of the employee's compensation claim and that the standard of care applicable to such carrier's duty to process claims in good faith is simple negligence. We affirm in part and reverse in part.

I

On December 2, 1977, William Savio fell from a ladder while working as a journeyman electrician for Fischbach & Moore, Inc., and injured his right ankle. Travelers Insurance Co., the workers compensation insurance carrier for Fischbach & Moore, subsequently admitted liability for temporary total disability. Although he had difficulty walking and experienced pain, Savio resumed his employment on January 17, 1978. His ankle continued to cause pain, however, and on September 12, 1978, a subtalar fusion (arthrodesis) was performed on the ankle by Dr. Donald Gazibara.

Savio's ankle remained in a cast for some twelve weeks, and he had limited mobility for several months thereafter. From November of 1978 through February of 1979, monthly reports filed with the Industrial Commission by Dr. Gazibara indicated that the permanency of Savio's disability was "undetermined" and did not project a date when Savio would be able to return to work. In March of 1979, Dr. Gazibara reported that the fusion of the subtalar joint had failed. On April 2, 1979, he performed surgery to re-fuse the joint. Through July of 1979, Dr. Gazibara's monthly reports indicated that the degree of permanency of Savio's disability was undetermined and that Savio remained unable to work.

In July of 1979, Savio received an offer of employment from Joe Rock of Broyles & Rock Plumbing and Electric in Colorado Springs, Colorado, to perform estimating and office work services if Savio completed a week-long course in estimating offered by the Estimatic Corporation. One such course was scheduled in August. On July 26, 1979, Savio's attorney sent a letter to

Travelers' counsel indicating that Savio desired vocational rehabilitation and summarizing the training program and attendant expenses. The letter stated that "there [was] a strong probability" that Savio would obtain work if he completed the course and requested Travelers to advise Savio's attorney whether Savio could enroll in the course and whether the cost would be covered by the Act.

Travelers' attorney forwarded this letter to Eugene Lehner, an assistant claims manager for Travelers with authority over vocational rehabilitation claims, with the comment that "it would seem that [Savio] would be entitled to vocational benefits." Travelers' attorney also recommended that Lehner investigate the matter and, if the course seemed attractive, to secure Division of Labor approval prior to providing the benefits.

Lehner reviewed Savio's file and wrote on a review form dated the first week of August 1979, that the "[e]mployee will probably not be able to return to work as an electrician. Consider retraining under Rehab portion of Act." Lehner determined, however, that Savio was not at that time entitled to vocational rehabilitation benefits.[1] Lehner neither contacted Dr. Gazibara for further information nor communicated to anyone his decision to deny Savio's rehabilitation request.

In his October 1979 monthly report, Dr. Gazibara projected that Savio could return to work on January 1, 1980, and recommended that he be considered for rehabilitation. This report also noted that Savio continued to have difficulty standing for more than a couple of hours and that the permanency of the disability remained "undetermined." After receiving this report, Lehner assigned Savio's claim to a Travelers representative, Dottie Healy, R.N., for assistance in preparing a rehabilitation plan. The assignment letter concluded:

In light of the rather bleak outlook for Mr. Savio, I would appreciate it if you would contact [Savio's attorney], gather what information you can in regard to the Estimatic Corporation of Denver, get some background as to what kind of course they offer, the cost, etc.

After conducting an investigation, Healy reported the following findings: the next available estimating course was scheduled for March 4–7, 1980, in Denver; that Savio's ankle was useless except on flat surfaces; and that Savio had slim chances of obtaining an estimating job if the opening at Broyles & Rock were filled. In December of 1979, she met with Joe Rock and learned that the estimating position with his company was no longer available. During this period of time, Dr. Gazibara's monthly reports revised the projected date when Savio would be able to return to work to May 1, 1980. The December report noted the development of painful bony growths on Savio's ankle; on January 15, 1980, the growths were excised.

On January 25, 1980, Savio's attorney wrote to Travelers seeking information on the status of Savio's rehabilitation request. Three weeks later, Travelers' attorney wrote a letter to Lehner noting a lack of action on Savio's request and suggesting reexamination of Savio to determine if he had attained "maximum medical improvement." Apparently, Travelers did not examine Savio for this purpose at that time.

Following the January operation, Healy met with Savio and contacted Savio's attorney. In a February 27, 1980, report to Lehner, Healy stated that Savio was well-motivated and was physically able to attend an Estimatic course in Denver in March. Although Savio had no immediate job prospects for estimating, Healy secured a place for him in the course, contingent on notification by February 29; informed Savio that Travelers would pay all expenses and tuition; and stated that she would call him

---

1. According to Lehner, the company determined a claimant's eligibility for rehabilitation upon two general factors: (1) whether the claimant was medically stable; and (2) whether employment opportunities existed in areas within the claimant's interests and abilities. Lehner stated in a deposition that in denying Savio's claims he relied to a large extent on Dr. Gazibara's monthly reports.

back to explain the details of the course. Her report to Lehner concluded: "I have discussed this file with Asst Mgr Lehner and he will take further action on it." No action was taken by Travelers at that time, however, and Savio did not attend that course.

Savio's claim was referred to the Division of Rehabilitation, Colorado Department of Social Services, and on April 10, 1980, the Division wrote to Healy requesting Travelers' position with respect to liability for vocational rehabilitation benefits. Two weeks later, in the absence of any response from Healy, Savio's rehabilitation counselor sent a letter to the Division of Labor inquiring into Savio's status. In May 1980, Travelers determined that Savio should receive vocational rehabilitation. Lehner requested the Division of Rehabilitation to develop a rehabilitation plan within two weeks, including an analysis of the labor market for estimators. In June 1980, the parties agreed to a vocational rehabilitation plan involving training at Colorado Technical College which would lead to employment constructing computer chips. Midway through this program, however, Savio received a new offer from Broyles & Rock to perform estimating work. He accepted that job as of November 17, 1980, with the approval of Dr. Gazibara and Travelers, and completed the Estimatic course in December, at Travelers' expense.

Savio commenced this civil action against Travelers on August 1, 1980, seeking compensatory and punitive damages on two claims. Savio's first claim contains the following allegations:

20. Defendant delayed and denied Plaintiff vocational rehabilitation benefits required by law without a reasonable basis, and at the time of delay or denial knew that there was no reasonable basis for that delay or denial.

21. Defendant corporation's tortious conduct constitutes a breach of its implied covenant of good faith and fair dealing which it owes to Plaintiff.

The first claim also alleges that Travelers' conduct "was attended by circumstances of malice and insult, and wanton and reckless disregard of Plaintiff's rights and feelings." Savio's second claim alleges that Travelers' conduct constituted a breach of contract.

Travelers moved to dismiss Savio's complaint, asserting that the Workmen's Compensation Act, §§ 8–40–101 to 8–54–127, 3 C.R.S. (1973 & 1984 Supp.), provides the exclusive remedies and forum for the injuries alleged in Savio's complaint. The trial court denied the motion, and Savio then filed a motion for partial summary judgment on the issue of Travelers' liability, relying in part on depositions of Healy and Lehner and on the affidavit of Dr. Garth Eldredge, a professor of vocational rehabilitation at the University of Northern Colorado.[2] Dr. Eldredge's affidavit contained statements that Savio should have been referred for vocational rehabilitation in February of 1979, and certainly no later than July 26, 1979, and that Lehner was not qualified to determine Savio's eligibility for rehabilitation.

Characterizing Savio's first claim as one for the intentional infliction of emotional distress, the trial court denied Savio's motion on the basis that certain material issues of fact remained in dispute. The trial court also stated that there was "no material issue of fact as to the negligence of the Defendant in processing this claim."

Savio then filed a motion for reconsideration, which motion contained the following description of his first claim:

Plaintiff[']s complaint is pled in simple negligence. The tort of bad faith is a simple negligence cause of action. The basis of Plaintiff's Motion for Summary of [sic] Judgment was based upon the Defendant's *negligent* handling of Plaintiff's claim.

---

**2.** The motion also sought a determination that Savio had presented a prima facie case for exemplary damages. The trial court denied that portion of the motion, finding that "the evidence is insufficient at this point to establish a prima facie case." This ruling, which was affirmed by the Court of Appeals, has not been appealed.

. . . .

[T]his Court, having ruled as a matter of law the Defendant was negligent in its processing of Plaintiff's claim, is compelled to grant Summary of [sic] Judgment.

(emphasis in original). The trial court again denied Savio's motion, this time stating that Travelers' argument that the Act provided Savio's exclusive remedy constituted a viable defense and that it remained unclear whether facts material to that defense were in dispute.

Savio then filed a second motion for partial summary judgment, asserting that Travelers' negligent acts, occurring after Savio's employment with Fischbach & Moore had ended, did not arise out of or during the course of his employment and that, therefore, the Act did not bar his claim. Travelers responded by asserting that the Act barred Savio's action, that Colorado does not and should not recognize the tort of bad faith in the context of a direct coverage workers compensation claim,[3] and that the trial court should reconsider its denial of Travelers' motion to dismiss. The trial court then entered a judgment dismissing Savio's complaint, ruling that no cause of action exists for the negligent processing of a claim in a direct coverage case and that even if such cause of action existed it would be barred by the Workmen's Compensation Act which provides the exclusive remedy for the plaintiff.[4]

Savio appealed, and the Court of Appeals reversed, holding that an employee, as a third-party beneficiary to a workers compensation insurance contract, may assert a claim of bad faith against the insurer; that a claim for alleged bad faith handling of a claim for compensation is not precluded by the Workmen's Compensation Act; and that in the direct coverage context simple negligence, or reasonableness, is the only standard applicable to the issue of whether an insurer has failed to honor a claim or has delayed payment in bad faith. *See Savio*, 678 P.2d at 552–53.[5] We granted Travelers' petition for certiorari to review these determinations of the Court of Appeals.

II

Travelers argues that provisions of the Workmen's Compensation Act of Colorado and rules promulgated by the Industrial Commission under the authority of the Act provide the exclusive remedies for Savio's complaints and place exclusive jurisdiction of this case within the Division of Labor. Alternatively, Travelers asserts that Savio must at least exhaust the administrative remedies provided by the Act before seeking judicial relief. These arguments are not supported by the language of the Act or by prior decisions of this court.

The Act provides a comprehensive system of compensation for workers, employed by participating employers, who are injured in the course of their employment. *Kandt v. Evans*, 645 P.2d 1300, 1302 (Colo.

---

**3.** Travelers also filed an affidavit of Craig Brown, its assistant claims manager, who had reviewed Savio's claim file. Brown described Travelers' action on the claim and its reasons therefor and asserted that any delays were due to Savio's failure to request a hearing on his claim with the Division of Labor. Savio moved to strike the affidavit as untimely filed. How the trial court ruled on this motion is not a matter of record; we find the document irrelevant to the issues in the appeal.

**4.** The trial court also ruled that Savio's breach of contract claim was barred by the Workmen's Compensation Act, a ruling Savio did not appeal.

**5.** Savio raised three other issues in the Court of Appeals: (1) whether the provision concerning unfair claim settlement practices in § 10–3–1104(1)(h), 4 C.R.S. (1973 & 1984 Supp.), creates an implied private cause of action against insurers, *cf. Farmer's Group, Inc. v. Trimble*, 658 P.2d 1370, 1378 (Colo.App.1982), *aff'd*, 691 P.2d 1138 (Colo.1984) (holding to the contrary); (2) whether violation of the duties contained in § 10–3–1104(1)(h) constitutes negligence *per se;* and (3) whether a prima facie case for exemplary damages had been established. Travelers did not cross-appeal the trial court's finding that the undisputed facts constitute negligence on its part.

1982). It replaced the often large but more often uncertain damage awards available through common law negligence actions with a relatively swift and more predictable statutorily prescribed recovery for injuries sustained in the course of employment without regard to fault. *See, e.g., Ryan v. Centennial Race Track, Inc.,* 196 Colo. 30, 580 P.2d 794 (1978); *Industrial Commission v. Schaefer Realty Co.,* 98 Colo. 445, 56 P.2d 51 (1936). The Act contains the following language limiting the liability of employers and insurance carriers for injuries sustained by employees:

> An employer who has complied with the provisions of articles 40 to 54 of this title, including the provisions relating to insurance [or the insurance carrier, if any, insuring the employer's liability under said articles], shall not be subject ... to any other liability for the death of or personal injury to any employee, except as provided in said articles; and all causes of action, actions at law, suits in equity, proceedings, and statutory and common law rights and remedies for and on account of such death of or personal injury to any such employee and accruing to any person are abolished except as provided in said articles.

§ 8–42–102, 3 C.R.S. (1984 Supp.). This limitation of liability is further described in the Act as

> a surrender by the employer, his insurance carrier, and the employee of their rights to any method, form, or amount of compensation or determination thereof or to any cause of action, action at law, suit in equity, or statutory or common-law right, remedy, or proceeding for or on account of such personal injuries or death of such employee other than as provided in said articles, and shall be an acceptance of all the provisions of said articles, and shall bind the employee himself, and, for compensation for his death, his personal representatives, a surviving spouse, and his next of kin, as well as the employer, his insurance carrier, and

those conducting their business during bankruptcy or insolvency.

*Id.* § 8–43–104.

■ This broad language articulates a legislative decision to establish exclusive as well as comprehensive remedies for injuries that are covered by the Act. *See, e.g., Ward v. Denver & R.G.W.Ry. Co.,* 119 F.Supp. 112, 114 (D.Colo.1954); *Ryan,* 196 Colo. 30, 580 P.2d 794; *Ellis v. Rocky Mountain Empire Sports, Inc.,* 43 Colo. App. 166, 602 P.2d 895 (1979). Citing the above statutory provisions and decisions, Travelers contends that the Act comprehends a resolution of all matters and disputes that germinate from a covered injury. In those cases, however, the issue has been whether the injury or the status of the party sought to be held liable is covered by particular provisions of the Act. The exclusive liability sections apply expressly only to injuries and parties covered by the Act. Conversely, if either the injury or a party's status falls outside the ambit of the Act, then the liability and exclusivity provisions of the Act are inapplicable. *See Thomas v. Farnsworth Chambers Co.,* 286 F.2d 270 (10th Cir.1960) (immunity should be coextensive with liability); *Wright v. District Court,* 661 P.2d 1167 (Colo.1983) (malpractice by co-employee doctor not a risk included in the Act's mutual compromise of employee and employer rights). *See generally* 2A A. Larson, *The Law of Workmen's Compensation* § 65.00, at 12–1 (1983) ("if the injury itself comes within the coverage formula, an action for damages is barred"). The initial inquiry, therefore, is whether Savio's alleged injury is an injury covered by the Act.

The Act contains no provision indicating that claims against an employer or insurer for bad faith in handling a claim for compensation or treatment are covered by its provisions, nor does the Act suggest any limitation on the potential remedies available for such conduct. Rather the Act is primarily directed to the delineation of appropriate treatment of employment-related injuries and compensation to injured employees or, in the case of death, to the employees' dependents. *See* §§ 8–49–

101(1)(a), 8–50–101 to –117, 8–51–101 to –109, 3 C.R.S. (1973 & 1984 Supp.) [6]

■ The Act conditions an employee's right to recover benefits as follows:

**Conditions of recovery.** (1) The right to the compensation provided for in articles 40 to 54 of this title, in lieu of any other liability to any person for any personal injury or death resulting therefrom, shall obtain in all cases where the following conditions occur:

(a) Where, at the time of the injury, both employer and employee are subject to the provisions of said articles and where the employer has complied with the provisions thereof regarding insurance;

(b) *Where, at the time of the injury, the employee is performing service arising out of and in the course of his employment;*

(c) Where the injury or death is proximately caused by an injury or occupational disease arising out of and in the course of his employment and is not intentionally self-inflicted.

§ 8–52–102, 3 C.R.S. (1984 Supp.) (emphasis added). At the time of the injuries alleged in Savio's complaint, he had ceased his employment relationship. Therefore, he was not at that time "performing service arising out of and in the course of his employment." By its terms, the Act does not apply to these injuries.

Travelers argues that any injury to an employee that would not have occurred "but for" the original injury should be held compensable exclusively under the Act, citing in support thereof a statement by Professor Larson that "a subsequent injury,

whether an aggravation of the original or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury," 1 A. Larson, *supra* § 13.11 at 3–348.91, and the "quasi-course of employment" doctrine espoused therein. *See id.* § 13–11(d). However, this comment occurs in the context of a discussion about whether a subsequent injury or a medical aggravation of an original injury due to treatment of or weakness caused by the original injury should be deemed an injury arising out of and in the course of employment.[7] No such circumstance exists here.

■ Furthermore, a subsequent injury is compensable under the quasi-course of employment doctrine only if it is the "direct and natural" consequence of an original injury which itself was compensable. *See* 1 A. Larson, *supra* § 13.11 at 3–348.91; *Wood v. State Accident Insurance Fund,* 30 Or.App. 1103, 569 P.2d 648 (1977) (accidental injury suffered during rehabilitation program compensable because direct and natural consequence of original injury). Whatever the proper scope of the doctrine, a compensation carrier's intentional misconduct in the processing of a claim is neither a "direct" nor a "natural" consequence of an employment injury. Any liability for injuries occasioned by such conduct cannot be deemed liability for injuries arising out of the course of employment. *Accord Gibson v. National Ben Franklin Insurance Co.,* 387 A.2d 220 (Me.1978); *Hayes v. Aetna Fire Underwriters,* 187 Mont. 148, 609 P.2d 257 (1980); *Coleman v. American Universal Insurance Co.,* 86 Wis.2d 615, 273 N.W.2d 220 (1979); *see also Martin v.*

---

**6.** Section 8–49–101(1)(a), 3 C.R.S. (1984 Supp.), the provision under which Savio claims entitlement to vocational rehabilitation benefits, establishes the following benefits for injured employees:

Every employer, regardless of his method of insurance, shall furnish such medical, surgical, dental, nursing, and hospital treatment, medical, hospital, and surgical supplies, crutches, apparatus, and vocational rehabilitation, which shall include tuition, fees, transportation, and weekly maintenance ... for the period of time that the employee is attend-

ing a vocational rehabilitation course, as may reasonably be needed at the time of the injury or occupational disease and thereafter during the disability and period of vocational rehabilitation, to cure and relieve from the effects of the injury.

**7.** In *Johnson v. Industrial Commission,* 148 Colo. 561, 366 P.2d 864 (1961), this court recognized that a death from pneumonia was proximately caused by the employee's prior compensable chest injury and, therefore, that the death was compensable under the Act.

*Travelers Insurance Co.*, 497 F.2d 329 (1st Cir.1974) (same result under federal Longshoremen and Harbor Workers' Compensation Act).

This conclusion is supported by two recent decisions by this court. In *Kandt v. Evans*, 645 P.2d 1300 (Colo.1982), we held that the Act provides the exclusive remedy for an intentional tort claim of outrageous conduct by a co-employee when the co-employee acts within the scope of employment. We indicated, however, that a tort action could be brought if the co-employee's acts were outside the course of employment. The distinction rested upon whether the injury suffered was a risk assumed within the exchange of common law remedies for liability without fault in the workers compensation scheme. *See id.* at 1302. We followed this reasoning in *Wright v. District Court*, 661 P.2d 1167 (Colo.1983), wherein we held that malpractice by a company physician, a risk not contemplated by the Act, is not immunized from tort suit by the co-employee immunity provisions of the Act. We conclude that bad faith handling of a claim by an insurer is similarly not a risk contemplated by the general coverage provisions of the Act.

It is true, as Travelers suggests, that the provisions of the Act establishing benefits for medical treatment and for temporary total and permanent disability, §§ 8–49–101, 8–51–102 to –108, 3 C.R.S. (1973 & 1984 Supp.), in effect provide Savio with some compensation for any protracted disability he may have sustained as the result of a delay in receiving vocational rehabilitation training. However recompensed by these provisions, the original disability due to Savio's ankle injury is distinct from the injuries Savio now asserts, namely that the alleged wrongful delay has caused loss of income; mental distress, including "the shame and humiliation of unemployment" and "worry and concern of financial indebtedness"; and loss of attorney fees for the prosecution of the case. These alleged injuries did not result from Savio's employment or from any injury he sustained while employed. Any recovery for such asserted injuries must be realized in courts of law because the Act provides no remedy for these injuries.[8]

Citing sections 8–44–106 and 8–53–126 to –129, 3 C.R.S. (1973),[9] Travelers argues that penalty provisions in the Act provide Savio with a remedy for any insurer misconduct. Section 8–44–106, 3 C.R.S. (1973), provides that "[i]f any insurance carrier intentionally, knowingly, or willfully violates any of the provisions of articles 40 to 54 of this title, the commissioner of insurance, on the request of the director, shall suspend or revoke the license or authority of such carrier to do a compensation business in this state." It may be that an insurance carrier which acts in bad faith toward a claimant may also violate this provision. However risky such conduct may be to an insurer's own interest, the provision does not provide any remedy for the individual injured thereby.

Section 8–53–126, 3 C.R.S. (1973), states as follows:

Any employer or insurer, or any officer or agent of either, or any employee, or any other person who violates any provision of articles 40 to 54 of this title, or does any act prohibited thereby, or fails or refuses to perform any duty lawfully enjoined within the time prescribed by the director or commission, for which no penalty has been specifically provided, or fails, neglects, or refuses to obey any lawful order made by the director or commission or any judgment or decree made by any court as provided by said articles shall be punished by a fine of not more than one hundred dollars for each such offense.

---

8. In computing damages for loss of income, it may be appropriate, in order to prevent any double recovery, to set off the loss by the amount of compensation Savio received during that period of time.

9. Sections 8–53–126 to –129 were repealed and reenacted in 1983 as §§ 8–53–116 to –118 and 8–53–128 in substantially the same form. *See* ch. 79, sec. 1, §§ 8–53–116 to –118 and 8–53–128, 1983 Colo.Sess.Laws 416, 421–22, 424.

The Act also provides that each day of violation constitutes a separate violation. *Id.* § 8–53–127. It must first be noted that the penalties imposed by these provisions are not available as compensation to wronged individuals, but rather are credited to the subsequent injury fund.[10] *Id.* § 8–53–128. Furthermore, the right to commence an action to recover such penalties is given to the attorney general and other governmental or agency attorneys only "[u]pon the request of the director [of the Division of Labor] or the [Industrial] [C]ommission." *Id.* § 8–53–129. While these penalties serve to deter conduct which violates the Act or orders entered pursuant thereto, they do not provide any direct remedy to employees such as Savio who may claim injuries from the same conduct which is proscribed by the penalty provisions.[11]

Describing procedures set forth in the Industrial Commission's Rules of Procedure Relative to Vocational Rehabilitation (RPRVR), Travelers next submits that administrative remedies are available to Savio under the Act. The rules relied on by Travelers do the following: (1) define when an employee is qualified for vocational rehabilitation, Rule II(f), RPRVR; (2) place a

mandatory duty on the employer or carrier to report the claimant's disability status to the Division of Labor, *id.* Rule III; (3) provide alternative avenues by which a vocational rehabilitation plan "shall be developed ... as soon as the need is identified, and requested by the carrier, or the employer, or the Division," *id.* Rule IV; (4) describe the contents required of a proposed rehabilitation plan, *id.* Rule V(1), (2); (5) establish a means for resolving disputes between the insurer or employer and the employee, *id.* Rule V(3), (5), (6); and (6) provide for official resolution of disputes and state when an approved plan shall begin, Rule V(4), (5).[12] These rules allow an employee to secure official intervention when an insurer delays or denies providing rehabilitation services. However, the relief available—an order approving a rehabilitation plan and specifying a date for implementation—is only the substantive benefit sought by the employee. Such remedy does not compensate a claimant for any injury caused by a bad faith delay or denial by the employer or insurance carrier.

■ Travelers' argument rests on the mistaken premise that an insurer's duty of good faith does not arise until *after* an official body orders benefits to be provided. As will be explained in the succeeding sec-

10. The subsequent injury fund provides additional compensation to an employee who has previously sustained permanent partial disability and in a subsequent injury incurs additional permanent partial disability rendering the employee "permanently and totally incapable of steady gainful employment." § 8–51–106(1)(a), 3 C.R.S. (1984 Supp.). There is no suggestion that Savio could claim the benefits from this fund.

11. Travelers also contends that the provision for interest "upon all sums not paid upon the date fixed by the award of the director," § 8–52–109(2), 3 C.R.S. (1973), affords Savio a remedy. Even assuming *arguendo* that a bad faith delay in the provisions of vocational rehabilitation entitles the claimant to interest from the date of bad faith, interest merely secures the claimant the equivalent of what he was entitled to initially. In no sense does it confer an added benefit or constitute a penalty. *But cf. Hormann v. New Hampshire Insurance Co.,* 236 Kan. 190, 689 P.2d 837 (1984) (interest provision for compensation found due and unpaid is a penalty for bad faith under wording of Kansas Act). This

argument also defeats Travelers' contentions that the provision of a lien against assets of the employer or insurer, § 8–52–109(1), 3 C.R.S. (1973), and the section empowering the Industrial Commission to order any insurer or employer to pay into the Division an amount equal to all unpaid compensation or benefits, to be held by the Division in trust, when the ability of a particular insurance carrier or employer to pay pending claims is threatened, § 8–52–112, 3 C.R.S. (1973 & 1984 Supp.), provide remedies for bad faith.

12. Under Rule V(6) of the RPRVR, an employee seeking vocational rehabilitation may request a hearing to determine eligibility for such services. Since § 8–53–104, 3 C.R.S. (1973), provides that "[a]fter the conclusion of every hearing the referee shall make a summary order allowing or denying said claim," Travelers also submits that Savio could have minimized the delay in receiving rehabilitation by invoking this statutory remedy. This section was repealed and reenacted in 1983 with changes immaterial to this case. *See* ch. 79, sec. 1, § 8–53–104, 1983 Colo.Sess.Laws 416, 417–18.

tion of this opinion, the duty of good faith derives from the relationship of an insured claimant to the provider of benefits. This relationship, arising from the underlying insurance or compensation obligation, precedes official intervention and permeates all of the dealings between the parties. It follows inevitably from these premises that an order securing benefits does not and cannot remedy separate injuries caused by a prior bad faith delay or denial of benefits.[13]

Travelers also relies on the procedural rules cited above to suggest that Savio must exhaust his administrative remedies. *See. Paradissis v. Royal Indemnity Co.*, 496 S.W.2d 146, 150 (Tex.Civ.App.1973), *aff'd*, 507 S.W.2d 526 (Tex.1974) (employee must exhaust self-help remedies under Texas act before maintaining state court action). It finds support for this argument in section 8–53–101, 3 C.R.S. (1973),[14] which provides: "Any dispute or controversy concerning compensation under articles 40 to 54 of this title shall be submitted to the division in the manner and with the effect as provided in this article." [15] Considering Savio's complaint to be a "controversy concerning compensation," Travelers argues

---

**13.** The Court of Appeals correctly concluded that the initial responsibility for identifying the need for a vocational rehabilitation plan rests with the employer or insurance carrier. *See Savio*, 678 P.2d at 553 (discussing Rule III, RPRVR). Travelers submitted no proof to the trial court that it had complied with its duty under Rule III to report Savio's status to the Division.

Travelers, joined by amicus, Colorado Defense Lawyers Association, also asserts that Rule V, amended in 1983, enhances the procedural remedy available to Savio and evinces an intent to resolve the issue of delay within the Division of Labor. Contrary to their assertion, the newly amended rule does not retroactively provide Savio a remedy. *Cf. Krumback v. Dow Chemical Co.*, 676 P.2d 1215, 1218 (Colo.App.1983) (procedural changes are immediately applicable to existing causes of action). The new procedures may indeed alleviate some of the ill effects of unwarranted delay by those obligated to provide rehabilitation benefits. The lessening of unwarranted delays, however, does not necessarily remedy, prospectively or retrospectively, injuries allegedly due to bad faith.

As supplemental authority, Travelers submits *Allis-Chalmers Corp. v. Lueck*, —— U.S. ——, ——, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985), which held that a bad faith claim asserted in state court by a union employee against his employer regarding disability benefits available under a collective-bargaining agreement must either be treated as a claim for violation of the labor contract under 29 U.S.C. § 185(a) (1982) (§ 301 of the Labor Management Relations Act) and resolved according to federal law or dismissed as preempted by federal labor-contract law. The underlying contract provided a four-step grievance procedure culminating in final and binding arbitration if the union pursued the grievance that far. 105 S.Ct. at 1907. Because the meaning of the contract underlay both the grievance procedure and the tort of bad faith, the Court reasoned that "interests in [national] interpretive uniformity and predict-

ability" require that collective-bargaining agreements "be subject to uniform federal interpretation." *Id.* at 1911. Additionally, the Court concluded that the tort, unless preempted, infringed on the contractual right to arbitration. There are no comparable concerns in this case. First, a non-uniform interpretation of workers compensation statutes and insurance contracts in this state is not threatened because those matters are subject ultimately to review by this court. Also, there is no right under the Act to have this issue resolved by the Division of Labor.

Finally, amicus Colorado Defense Lawyers Association invites this court to mandate new rule-making if we believe that the amended rules are insufficient to rectify problems of delay. We decline the invitation; the authority to promulgate rules for an executive agency resides in departments of government other than the judiciary. *See generally* Colo. Const. art. III.

**14.** Section 8–53–101 was repealed and reenacted in 1983 to read: "The director and hearing officers employed by the division of hearing officers in the department of administration shall have original jurisdiction to hear and decide all matters arising under articles 40 to 54 of this title." *See* ch. 79, sec. 1, § 8–53–101, 1983 Colo. Sess.Laws 416, 416. Contending that this amendment is procedural and therefore applies to Savio's case, *see Krumback*, 676 P.2d 1215, Travelers reiterates its position that the Division of Labor has exclusive jurisdiction over this action. Assuming for the sake of argument that statutes regulating jurisdiction are procedural, the jurisdiction conferred pertains to "matters arising under" the Act. Since a bad faith claim falls outside of those matters, this provision cannot place jurisdiction over the claim within the Division.

**15.** Rule V(5) of the RPRVR similarly provides that "[a]ll matters regarding rehabilitation plans or programs shall be initially submitted to the Division...."

that the Division of Labor provides an administrative remedy that must be exhausted before court action may be initiated. However, as previously noted, a bad faith claim is not subject to "compensation" or any other remedy under the Act. Savio certainly need not exhaust an administrative remedy that is in fact nonexistent. *See, e.g., Gramiger v. Crowley*, 660 P.2d 1279, 1281 (Colo.1983) (exhaustion of administrative remedies doctrine does not apply where agency has no authority to determine the issue raised).

Finally, Travelers argues that recognition of Savio's right to file a common law action for recovery on a claim of bad faith breach of contract will partially dismantle an administrative system intended to be all-encompassing. For authority, it relies on the decision of this court in *Roper v. Industrial Commission*, 93 Colo. 250, 25 P.2d 725 (1933), and a series of decisions from California beginning with *Noe v. Travelers Insurance Co.*, 172 Cal.App.2d 731, 342 P.2d 976 (1959). This argument erroneously assumes that the comprehensive scheme sought to be maintained in fact applies to Savio's claim—the very question which must be answered. Furthermore, the authorities relied upon by Travelers to support its argument are inapposite.

In *Roper*, an employee who had suffered a compensable injury brought an action in mandamus to compel the compensation carrier to pay benefits allegedly due under one of the Industrial Commission's rules of procedure. We concluded that mandamus was properly denied because the relief sought could have been pursued with the Industrial Commission and declared:

> One of the fundamental aims in adopting the act was that of substituting for any and all previously existing remedies the special procedure supplied by the act. Anything that tends to complicate the issues arising out of claims for compensation or to take the disposition thereof away from the commission must be firmly discouraged.

*Roper*, 93 Colo. at 253, 25 P.2d at 726. *Roper*, involving an action for compensa-

tion available under the Act, is clearly distinguishable from a tort action for bad faith which asserts injuries not compensable under the Act.

In *Noe*, the California Court of Appeals held that an employee's suit against her employer's insurance carrier for negligent delay in providing, and wanton misconduct in refusing, medical care was barred by the exclusive sweep of the California Workmen's Compensation Act. The court affirmed dismissal of the negligence count on two grounds. First, it concluded that the California Act contemplated and provided a remedy for refusal to furnish reasonable medical treatment. *See Noe*, 342 P.2d at 978. The California Act, unlike Colorado's, expressly addressed an employer's "neglect or refusal seasonably to [provide medical treatment]" and stated that "the employer is liable for the reasonable expense incurred by or on behalf of the employee in providing treatment." Cal. Labor Code § 4600 (West 1985). The court held, therefore, that the injury alleged was a risk contemplated by the legislation. Our Act contains no comparable provision, and this court has declined in the past to find legislatively imposed limits on an employee's remedies outside of the Act unless such limits are express. *See Continental Sales Corp. v. Stookesberry*, 170 Colo. 16, 459 P.2d 566 (1969); *Great Western Sugar Co. v. Erbes*, 148 Colo. 566, 367 P.2d 329 (1961); *Chartier v. Winslow Crane Service Co.*, 142 Colo. 294, 350 P.2d 1044 (1960).

Beyond the statutory reasoning, the *Noe* court offered a second rationale as follows:

> [I]f delay in medical service attributable to a carrier could give rise to independent third party court actions, the system of workmen's compensation could be subjected to a process of partial disintegration. In the practical operation of the plan, minor delays in getting medical service, such as for a few days or even a few hours, caused by a carrier, could become the bases of independent suits, and these could be many and manifold indeed. The uniform and exclusvie application of the law would become honey-

combed with independent and conflicting rulings of the courts. The objective of the Legislature and the whole pattern of workmen's compensation could thereby be partially nullified.

*Noe,* 342 P.2d at 979–80.[16] This passage was quoted approvingly by the California Supreme Court in *Unruh v. Truck Insurance Exchange,* 7 Cal.3d 616, 628, 498 P.2d 1063, 1071–72, 102 Cal.Rptr. 815, 823–24 (1972).

In *Unruh,* an insurer's investigator, whose employment position was unknown to the claimant, befriended the claimant who had suffered a back injury and took her to Disneyland while another investigator covertly photographed her on a rope bridge and other apparatus. At a workers compensation hearing, the insurer exhibited these films, allegedly causing the claimant to suffer a physical and mental breakdown. She filed a civil action against the insurer and its investigators, asserting theories of negligence, assault, and intentional infliction of emotional distress and seeking punitive damages. The *Unruh* court, following *Noe,* held that a claim against an insurer for negligent conduct in investigating a workers compensation claim was barred by the California Act. Reasoning that investigation by an insurer "constitutes a service 'inextricably interwoven' with the insurer's status," it concluded that, as long as the insurer acts within the role contemplated by the Act, liability should not be imposed beyond the provisions within the Act. *See id.* at 627, 498 P.2d at 1071, 102 Cal.Rptr. at 823. However, the court reinstated counts alleging assault and battery, intentional infliction of emotional distress and punitive damages for the reason that such insurer conduct removes the insurer from its normal role. *See id.* at 630–31, 498 P.2d at 1073, 102 Cal.Rptr. at 825.

In light of the material differences between the California and Colorado Acts with regard to express remedies for ne-

glect or unreasonable refusal by an insurer, the rationale of *Noe* and *Unruh* is inapplicable. The concern that permitting state court tort actions to proceed will produce serious and manifold conflicts between rulings of the courts of law and workers compensation agencies arises only when the same legal issue is committed to both systems for resolution. Such overlap does not exist between our statutes and the tort of bad faith. The duty of an insurer under the Act to provide benefits and compensation is factually and analytically distinct from its duty to deal in good faith with claimants, even though such duties necessarily involve a common underlying physical injury. The right to compensation depends on the resolution of specific factual and legal issues between carriers and claimants. Whether in a particular case disputes involving those issues are entertained in good faith presents a related, but quite different, question, the resolution of which does not depend on the validity of the underlying compensation claim.

In *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138 (Colo.1984), we rejected the insurer's contention that absent actual exposure to a judgment in excess of policy limits there could be no breach of the duty of good faith, and held that the bad faith conduct of the insurer, rather than the actual liability caused by that bad faith, formed the basis of the tort. *Id.* at 1142. Similarly in this case, the tort of bad faith depends on the conduct of the insurer regardless of the ultimate resolution of the underlying compensation claim. For example, Savio's request for rehabilitation was finally resolved in May of 1980. That resolution, or even a contrary resolution at that time, sheds little light on the question of whether Travelers acted in good faith throughout the preceding year on Savio's request for rehabilitation training.

In sum, we find the injuries complained of by Savio to be injuries not covered by the Act and not redressed by any

---

**16.** The court affirmed dismissal of the second count, alleging that the failure to furnish medical care was "willful and wanton," because the facts did not indicate an intervening personal assault on the claimant had occurred.

provision of the Act. We hold, therefore, that the Workmen's Compensation Act does not bar Savio from bringing a tort action in state court for damages arising from bad faith in the processing of his request for rehabilitation.[17]

### III

Having concluded that Savio's claim against Travelers is not a claim for an injury covered by the Act, and, therefore, is cognizable as a common law action, we must determine whether the Court of Appeals erred in ruling that Savio's complaint stated a claim upon which relief may be granted.

■■■ The trial court found that Savio's complaint was insufficient as a matter of law because it alleged simple negligence rather than some form of intentional mis-

---

**17.** The issue of whether a workers compensation act precludes tort actions for an insurer's conduct in handling a claim for benefits has arisen in several other American jurisdictions. The results naturally depend upon the particular facts alleged, the elements of those torts in the jurisdiction, and the provisions of the relevant workers compensation act. The result in most of these cases has been that the cause of action was held precluded. *See* 2A A. Larson, *supra* § 68–34(c) at 13–72; *see also* Annot., 8 A.L.R.4th 902 (1981).

Most of the courts that have held actions barred by the exclusivity provisions of a particular workers compensation act have found a remedy for the asserted injury within the act. *See Garvin v. Shewbart,* 442 So.2d 80 (Ala.1983) (provision for circuit court action provides remedy for negligent or bad faith failure to pay medical expenses); *Stafford v. Westchester Fire Insurance Co. of New York, Inc.,* 526 P.2d 37 (Alaska 1974), *overruled on other grounds, Cooper v. Argonaut Insurance Companies,* 556 P.2d 525 (Alaska 1976) (20% penalty for late payment of benefit installments provides remedy for negligent or bad faith delay); *Sandoval v. Salt River Project Agricultural Improvement & Power District,* 117 Ariz. 209, 571 P.2d 706 (Ariz.App. 1977) (act provides procedures in event of failure to provide benefits); *Cervantes v. Great American Insurance Co.,* 140 Cal.App.3d 763, 189 Cal.Rptr. 761 (1983) (10% penalty for unreasonable delay in payment is exclusive remedy for willful and intentional, as well as negligent, delay); *Old Republic Insurance Co. v. Whitworth,* 442 So.2d 1078 (Fla.App.1983) (penalty and attorney fee provisions are exclusive remedies for bad faith); *Robertson v. Travelers Insurance Co.,* 95 Ill.2d 441, 448 N.E.2d 866 (1983) (50% penalty for unreasonable or vexatious delay remedies insurer's malicious deception or outrageous conduct); *Harned v. Farmland Foods, Inc.,* 331 N.W.2d 98 (Iowa 1983) (statutory procedure for resolving dispute over treatment constitutes exclusive remedy); *Hormann v. New Hampshire Insurance Co.,* 236 Kan. 190, 689 P.2d 837 (1984) (8% interest when carrier refuses to pay without just cause or excuse is remedy for intentional refusals); *Paradissis v. Royal Indemnity Co.,* 507 S.W.2d 526 (Tex.1974) (self-help and administrative procedures provide sole relief for insurer's negligence).

A majority of these jurisdictions, however, have recognized that certain common law tort actions, particularly an action for the intentional infliction of emotional distress, may be maintained against a workers compensation insurer. *See Garvin,* 442 So.2d 80; *Stafford,* 526 P.2d 37; *Sandoval,* 117 Ariz. 209, 571 P.2d 706 (tortious conduct as breaking and entering not immunized); *Unruh,* 7 Cal.3d 616, 498 P.2d 1063, 102 Cal.Rptr. 815; *Sullivan v. Liberty Mutual Insurance Co.,* 367 So.2d 658 (Fla.App.1979) (statute provides exceptions for intentional assault and automobile accidents); *Robertson,* 95 Ill.2d 441, 69 Ill.Dec. 954, 448 N.E.2d 866 (penalty might not be exclusive remedy in *Unruh*-like facts); *Paradissis,* 507 S.W.2d 526 (willful torts such as fraud or outrageous conduct not within exclusivity bar of Texas act). Also, two jurisdictions have held that penalty provisions, although available, do not constitute exclusive remedies for insurer bad faith. *See Martin v. Travelers Insurance Co.,* 497 F.2d 329 (1st Cir.1974) (20% penalty for late payment not exclusive remedy); *Gibson v. National Ben Franklin Insurance Co.,* 387 A.2d 220 (Me.1978) (similar ruling).

Three jurisdictions recognize tort actions for bad faith outside of the relevant workers compensation act. *See Hollman v. Liberty Mutual Insurance Co.,* 712 F.2d 1259 (8th Cir.1983) (under South Dakota law); *Hayes v. Aetna Fire Underwriters,* 187 Mont. 148, 609 P.2d 257 (1980); *Coleman v. American Universal Insurance Co.,* 86 Wis.2d 615, 273 N.W.2d 220 (1979). Three others have recognized actions for conduct constituting bad faith although the tort was not characterized as such. *See Martin,* 497 F.2d 329; *Gibson,* 387 A.2d 220; *Broaddus v. Ferndale Fastener Division,* 84 Mich.App. 593, 269 N.W.2d 689 (1978).

The disparate holdings in these various decisions underscore the importance of the particular wording of state compensation acts in the development of this field of law. A legislature may, of course, revise any particular workers compensation act at any time. *See, e.g., Jadofsky v. Iowa Kemper Insurance Co.,* 120 Wis.2d 494, 355 N.W.2d 550 (Wis.App.1984) (bad faith cause of action barred by recently enacted remedy provision intended as exclusive remedy despite fact that bad faith is separate injury outside act's general exclusivity provisions).

conduct as the basis for the allegation that Travelers failed to process Savio's claim in good faith. The Court of Appeals reversed, concluding that the proper standard of conduct applicable to such tort was simple negligence. We affirm the result reached by the Court of Appeals, but reject its conclusion that simple negligence is the applicable standard. The standard for measuring the conduct of an insurer includes two elements: unreasonable conduct, and knowledge that the conduct is unreasonable or a reckless disregard for the fact that the conduct is unreasonable.

In *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984), this court recognized that an insurer handling claims against its insured by third parties owes its insured a duty of good faith and fair dealing. The instant case involves an insured employee who claims benefits for himself from his employer's workers compensation insurance carrier, a situation analogous to "first-party" or "direct" coverage contexts and, therefore, arguably distinguishable from "third-party" cases such as *Trimble*. Accordingly, we first consider whether a "direct" bad faith tort action may be brought by Savio against Travelers.

■ The Workmen's Compensation Act specifically regulates every contract for workers compensation insurance, *see* § 8–44–102, 3 C.R.S. (1973), and requires that every such contract "contain a clause to the effect that the insurance carrier shall be directly and primarily liable to the employee." *Id.* § 8–44–105. Thus, a covered employee stands in the same position as an insured in a private insurance contract. *Cf.* 11 G. Couch, *Cyclopedia of Insurance Law* § 44:206 (R. Anderson 2d ed. 1982) (employee is in effect third-party beneficiary to the contract). Conceived of as either "the insured" of an insurance contract or a third-party beneficiary with the right to sue on the contract, *see Montezuma Plumbing & Heating, Inc. v. Housing*

*Authority of Montezuma County*, 651 P.2d 426, 428 (Colo.App.1982), Savio claims benefits that he is entitled to under the terms of the insurance contract for himself, the essence of a first-party claim.[18]

Travelers suggests that in a first-party case, the insured should be limited to a breach of contract claim. *See Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980); *Haagenson v. National Farmers Union Property & Casualty Co.*, 277 N.W.2d 648 (Minn.1979). In light of the rationale of *Trimble*, 691 P.2d 1138, we reject this argument.

■ In *Trimble*, we reasoned that an insurer's duty of good faith to its insured when handling claims of third parties against the insured arises from the nature of insurance:

> The basis for liability in tort for the breach of an insurer's implied duty of good faith and fair dealing is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured. The motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage.

691 P.2d at 1141. Although in *Trimble* we emphasized certain features of the insurance relationship peculiar to third-party claims, the basic rationale for the conclusion that bad faith conduct by an insurer may be redressed by an action in tort extends to first-party claims by insured employees covered by workers compensation. The Act was adopted to protect workers from the economic calamity of disabling injuries. *See Padilla v. Industrial Com-*

---

**18.** Both the parties and amici treat this case as a first-party, direct coverage case. We agree that it is like a first-party case because workers compensation benefits serve a purpose similar to that served by direct coverage insurance con-

tracts. This similarity exists, of course, whether the liability for compensation remains with the employer or has been contracted out to an insurance carrier.

*mission,* 696 P.2d 273, 276 (Colo.1985); *Engelbrecht v. Hartford Accident & Indemnity Co.,* 680 P.2d 231, 233 (Colo.1984). Since workers compensation serves the same purpose as insurance in general, the *Trimble* rationale demands that the provider of such compensation deal fairly and in good faith with an employee asserting a compensable injury. *Accord Hayes v. Aetna Fire Underwriters,* 187 Mont. 148, 609 P.2d 257 (1980); *see also Birkenbuel v. Montana State Compensation Insurance Fund,* 687 P.2d 700 (Mont.1984).[19]

■ Furthermore, once a calamity has befallen an employee covered by workers compensation or an insured covered under a private insurance contract, the injured party is particularly vulnerable because of the injury or loss. Recognizing that a contract claim for the insurance proceeds may not effectively protect the injured party in such a situation, the Supreme Court of Rhode Island commented as follows:

[I]nsurers, backed by sufficient financial resources, are encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than that due under the policy .... The inequity of this situation becomes particularly apparent in the area of disability insurance in which the insured, often pursued by creditors and devoid of bargaining power, may easily be persuaded to settle for an amount substantially lower than that provided for in the insurance contract.

*Bibeault v. Hanover Insurance Co.,* 417 A.2d 313, 318 (R.I.1980); *see also Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866 (1981). *See generally Spencer v. Aetna Life & Casualty Co.,* 227 Kan. 914, 611 P.2d 149 (1980) (discussing courts' reasons for adopting bad faith tort). In light of these considerations of insurance generally, and of workers compensation in particular, we conclude that a claimant of compensation or benefits

**19.** In a first-party case, our Court of Appeals has held that an insured may sue the insurer for bad faith failure to deliver first-party insurance services. *Rederscheid v. Comprecare, Inc.,* 667 P.2d 766 (Colo.App.1983). A majority of other jurisdictions also recognize the tort of bad faith in direct coverage situations. *See Craft v. Economy Fire & Casualty Co.,* 572 F.2d 565 (7th Cir. 1978) (insured may sue insurer for bad faith handling of his claim for uninsured motorist coverage under Indiana law); *Phillips v. Aetna Life Insurance Co.,* 473 F.Supp. 984 (D.Vt.1979) (employee, covered by employer's health and disability insurance, may sue insurer for bad faith withholding of medical benefits under Vermont law); *United Services Automobile Association v. Werley,* 526 P.2d 28 (Alaska 1974) (same); *Chavers v. National Security Fire & Casualty Co.,* 405 So.2d 1 (Ala.1981) (per curiam) (first-party fire insurance claim); *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 647 P.2d 1127, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982) (claim by insured for medical benefits); *Gruenberg v. Aetna Insurance Co.,* 9 Cal.3d 566, 510 P.2d 1032, 108 Cal.Rptr. 480 (1973) (fire insurance); *Grand Sheet Metal Products Co. v. Protection Mutual Insurance Co.,* 34 Conn.Sup. 46, 375 A.2d 428 (1977) (same); *United States Fidelity & Guaranty Co. v. Peterson,* 91 Nev. 617, 540 P.2d 1070 (1975) (property damage insurance); *Chavez v. Chenoweth,* 89 N.M. 423, 553 P.2d 703 (N.M.App.1976) (automobile insurance); *Corwin Chrysler-Plymouth, Inc. v. Westchester Fire Insurance Co.,* 279 N.W.2d 638 (N.D.1979) (insurance covering business losses due to embezzlement); *McCorkle v. Great Atlantic Insurance Co.,* 637 P.2d 583 (Okla.1981) (fire insurance); *Bibeault v. Hanover Insurance Co.,* 417 A.2d 313 (R.I.1980) (uninsured motorist claim); *Nichols v. State Farm Mutual Automobile Insurance Co.,* 279 S.C. 336, 306 S.E.2d 616 (1983) (loss due to car theft); *MFA Mutual Insurance Co. v. Flint,* 574 S.W.2d 718 (Tenn.1978) (uninsured motorist coverage); *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978) (fire insurance).

A minority of jurisdictions have rejected an action in tort in first-party or direct coverage cases. *See Baxter v. Royal Indemnity Co.,* 285 So.2d 652 (Fla.App.1973), *cert. discharged,* 317 So.2d 725 (Fla.1975); *Leonard v. Firemen's Insurance Co. of Newark, New Jersey,* 100 Ga.App. 434, 111 S.E.2d 773 (1959); *Debolt v. Mutual of Omaha,* 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (1978); *Spencer v. Aetna Life & Casualty Co.,* 227 Kan. 914, 611 P.2d 149 (1980); *Kewin v. Massachusetts Mutual Life Insurance Co.,* 409 Mich. 401, 295 N.W.2d 50 (1980); *Haagenson v. National Farmers Union Property & Casualty Co.,* 277 N.W.2d 648 (Minn.1979); *Duncan v. Andrew County Mutual Insurance Co.,* 665 S.W.2d 13 (Mo.App.1983); *Lawton v. Great Southwest Fire Insurance Co.,* 118 N.H. 607, 392 A.2d 576 (1978); *Garden State Community Hospital v. Watson,* 191 N.J.Super. 225, 465 A.2d 1225 (App.Div.1982); *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 431 A.2d 966 (1981).

may bring an action in tort for bad faith by an insurer.

We next consider the question of what standard of care is applicable to direct or first-party claims of bad faith conduct by an insurance carrier. Savio urges that the negligence standard adopted by this court in *Trimble* should be extended to direct coverage cases.[20] Travelers contends the opposite: that in the context of first-party claims the tort of bad faith must include some component of intentional or willful conduct. We conclude that a workers compensation claimant who asserts that an insurer has failed to pay a claim in bad faith must establish that the insurer acted unreasonably and with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim.

In *Trimble*, we held that "the standard of conduct of an insurer in relation to its insured in a third party context must be characterized by general principles of negligence." 691 P.2d at 1142. The court further defined the standard in terms of this inquiry: " '[W]ould a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances.' " *Id.* (quoting *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 692, 271 N.W.2d 368, 377 (1978)). This standard is appropriate in view of certain factors that are of particular concern in the third-party context. As we wrote in *Trimble:*

> The standard of conduct on the part of the insurer when dealing with claims arising under an insurance policy is shaped by, and must reflect, the quasi-fiduciary relationship that exists between the insurer and the insured by virtue of the insurance contract. *Particularly when handling claims of third persons* that are brought against the insured, an insurance company stands in a position similar to that of a fiduciary.... By virtue of the insurance contract, the in-

surer retains the absolute right to control the defense of actions brought against the insured, and the insured is therefore precluded from interfering with the investigation and negotiation for settlement.

*Id.* at 1141 (emphasis added) (citations omitted).

In a first-party direct coverage case, by contrast, the insured has not ceded any right to represent his interests to the insurer. The insured can directly influence the insurer's claim evaluation process and may file a civil action to compel performance by the insurer or to seek damages for failure of the insurer to perform. The insurer, however, must be accorded wide latitude in its ability to investigate claims and to resist false or unfounded efforts to obtain funds not available under the contract of insurance. *See Chavers v. National Security Fire & Casualty Co.,* 405 So.2d 1 (Ala.1981) (per curiam). Thus, the relationship of the insured to the insurer in a first-party claim context is significantly different from the relationship which characterizes the third-party claim context. *See Craft v. Economy Fire & Casualty Co.,* 572 F.2d 565 (7th Cir.1978); *Vincent v. Blue Cross-Blue Shield of Alabama, Inc.,* 373 So.2d 1054, 1064 (Ala.1979) (Jones, J., specially concurring); *Duncan v. Andrew County Mutual Insurance Co.,* 665 S.W.2d 13 (Mo.App.1983) (while court recognized a tort action in third-party insurance contracts, it declined to extend the cause of action to first-party contracts); *Lawton v. Great Southwest Fire Insurance Co.,* 118 N.H. 607, 392 A.2d 576 (1978) (same); *Santilli v. State Farm Life Insurance Co.,* 278 Or. 53, 562 P.2d 965 (1977); *MFA Mutual Insurance Co. v. Flint,* 574 S.W.2d 718 (Tenn.1978). Courts in California, the first jurisdiction to recognize the existence of a bad faith tort action in a first-party insurer context, have long recognized significant differences between first-party and third-party cases. *See, e.g.,*

---

**20.** As the previous discussion indicates, bad faith is not limited to the decision to grant or deny a claim; rather, bad faith can occur in the

unreasonable refusal to investigate a claim and to gather facts.

*Sarchett v. Blue Shield of California,* 158 Cal.App.3d 218, 204 Cal.Rptr. 534 (1984); *Austero v. National Casualty Co. of Detroit, Michigan,* 84 Cal.App.3d 1, 148 Cal. Rptr. 653 (1978), *overruled on other grounds, Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 620 P.2d 141, 169 Cal.Rptr. 691 (1979). In defining the standard of care applicable in a first-party context, these distinctions should not be ignored. *See Employers Equitable Life Insurance Co. v. Williams,* 282 Ark. 29, 665 S.W.2d 873 (1984) (standard of care in third-party insurance tort action is negligence, while first-party cause of action requires "dishonest, malicious, or oppressive conduct").

In *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978), the Supreme Court of Wisconsin recognized the peculiar characteristics of first-party insurance claims and concluded that the appropriate standard for determining the presence or absence of bad faith dealing by an insurer with regard to a claim of its insured consisted of two parts: "the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id.* 271 N.W.2d at 376. The court made the following observations concerning the applicability of this standard in first-party cases:

> It is appropriate, in applying the test, to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review....

> While we have stated above that, for proof of bad faith, there must be an absence of a reasonable basis for denial of policy benefits *and* the knowledge or reckless disregard of a reasonable basis for a denial, implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.

> Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.

*Id.* 271 N.W.2d at 377 (emphasis in original).

The first element of this test—unreasonable conduct—was recognized in *Trimble* as the sole standard for the tort of bad faith dealing by an insurance carrier with its insured in a third-party setting. Whether an insurer has acted reasonably in denying or delaying approval of a claim will be determined on an objective basis, requiring proof of the standards of conduct in the industry. The second element of the test reflects a reasonable balance between the right of an insurance carrier to reject a non-compensable claim submitted by its insured and the obligation of such carrier to investigate and ultimately approve a valid claim of its insured. If an insurer does not know that its denial of or delay in processing a claim filed by its insured is unreasonable, and does not act with reckless disregard of a valid claim, the insurer's conduct would be based upon a permissible, albeit mistaken, belief that the claim is not compensable. While the distinction is subtle, recognition of the permissible scope of an insurer's right to refuse invalid claims requires the conclusion that in the context of a first-party claim the insured must establish the insurer's knowledge or reckless disregard of the fact that a valid claim has been submitted. *See Anderson,* 85 Wis.2d 675, 271 N.W.2d 368; *Noble v. National American Life Insurance Co.,* 128 Ariz. 188, 624 P.2d 866 (1981). For these reasons, we hold that in the first-party context an insurer acts in bad faith in delaying the processing of or denying a valid claim when the insurer's conduct is unreasonable and the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable. The conclusion of the Court of Appeals that the tort of bad faith conduct by an insurer in a

first-party context requires proof only of simple negligence is erroneous.

Of course, when assessing an insurer's conduct under this standard, the facts available to the insurer must be measured against the legal predicates governing the insured's request for payment. In this case, for example, Savio was entitled to vocational rehabilitation "as may reasonably be needed ... to cure and relieve from the effects of the injury." § 8–49–101(1)(a), 3 C.R.S. (1984 Supp.). Under the Industrial Commission's Rules of Procedure, an employee is defined as qualified for vocational rehabilitation when either (1) the injury precludes a return to the employee's customary work or to work for which the employee has previous training, Rule II(f), RPRVR; or (2) the employee will be employable, upon vocational rehabilitation, in employment that "offers an opportunity to restore the employee ... to maximum self-support ... given ... the employee's qualifications, interests, motivation ... and the present and future labor market," Rule II(h), RPRVR. The substance of these standards has relevance to both prongs of the test by which Travelers' conduct is to be measured.

We note that the issues here decided arise from the trial court's grant of Travelers' motion to dismiss. The motion, accompanied as it was by supporting factual assertions, must be deemed a motion for summary judgment, *see* C.R.C.P. 12(b), requiring this court to resolve all doubts as to whether a genuine issue of material fact exists against the moving party, *see* C.R.C.P. 56(c); *Jones v. Dressel*, 623 P.2d 370 (Colo.1981). In this posture, we conclude that Savio's complaint is sufficient to survive Travelers' motion.

It is undisputed that Savio's request for vocational rehabilitation was first made known to Travelers in late July of 1979. However, factual disputes remain for resolution before it can be determined whether the decision to deny Savio vocational rehabilitation at that or any other time was unreasonable; whether Travelers knew or should have known that the denial was unreasonable; or whether Travelers acted with a reckless disregard of or indifference to the validity of Savio's claim. While Savio's allegations of willful and wanton conduct and extreme indifference to his rights are material with respect to his claim for punitive damages, they also are germane to an evaluation of whether the first claim is sufficient to withstand a motion to dismiss.

## IV

In sum, we have concluded that the Workmen's Compensation Act does not bar Savio's common law action against Travelers for bad faith processing of his workers compensation claim. We have further concluded that in a direct or first-party context, such tort requires proof of unreasonable conduct and knowledge that the conduct is unreasonable or a reckless disregard of the fact that the conduct is unreasonable. When measuring the complaint and the factual material presented to the trial court, we agree with the conclusion of the Court of Appeals that Savio has alleged a claim for bad faith upon which relief can be granted.

Accordingly, we affirm the judgment of the Court of Appeals holding that the Workmen's Compensation Act does not preclude an employee from bringing a common law tort action against a workers compensation insurance carrier for bad faith, reverse the holding of the Court of Appeals that negligence is the proper measure of the tort of bad faith dealing by an insurer in the context of a first-party claim, and affirm the judgment of the Court of Appeals that the case be remanded to the trial court with directions to reinstate Savio's claim.

The judgment is affirmed in part and reversed in part.

ERICKSON, J., dissents.

ROVIRA, J., dissents.

NEIGHBORS, J., concurs in part and dissents in part.

ERICKSON, Justice, dissenting:

In my view, Colorado's Workmen's Compensation Act precludes Savio's tort claim against Travelers in this case.

The Colorado Workmen's Compensation Act (the Act) was intended by the General Assembly to provide an exclusive remedy for workers to recover an award for an industrial injury. The Act defines and limits the scope and amount of recovery available to injured workers. Insurers necessarily rely on the statutory scheme and agree to provide coverage to employers for the liability outlined in the Act.

In my view, we should not expand liability to include employee claims of insurer misconduct when the employee's "underlying injury" is covered by the Act and the employee has statutory remedies available under the Act to ensure prompt payment of a claim. §§ 8–53–103, –116, 3 C.R.S. (1984 Supp.). If an expansion of liability is to occur, it should be made by the General Assembly, as the legislature in California did, and not by judicial fiat. *See Unruh v. Truck Insurance Exchange*, 7 Cal.3d 616, 498 P.2d 1063, 102 Cal.Rptr. 815 (1972). A majority of states having workmen's compensation statutes (with "exclusivity" provisions like Colorado's) do not allow common-law tort claims for bad faith or negligent insurer delays in payment of employee claims covered by the compensation statute. *Robertson v. Travelers Insurance Co.*, 95 Ill.2d 441, 69 Ill.Dec. 954, 448 N.E.2d 866 (1983); 2A A. Larson, *The Law of Workmen's Compensation* § 68.34(c) (1983).

If a judicial remedy is to be created, I believe that the standard of care owed by insurers should be one of reasonable care (a negligence standard). Savio's "first-party" claim is not sufficiently distinguishable from the "third-party" claim in *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984), to justify application of the significantly different standard of care formulated by the court here.

Accordingly, I would reverse the judgment of the court of appeals and affirm the district court's dismissal of Savio's claim.

ROVIRA, Justice, dissenting:

The majority shapes out of whole cloth a new claim for relief outside the Workmen's Compensation Act (Act), a claim better left to creation by the legislature than the court.

The legislature has over the years developed a comprehensive scheme for compensating persons who suffer injury arising out of or in the scope of their employment. This detailed and extensive program has developed and expanded over the years along with provisions for the protection not only of the employee, but of employers and their insurance carriers.

The majority holds that the Act does not cover Savio's new injuries; namely, loss of income due to delay, mental distress, and loss of attorney fees for the prosecution of his case. In support of this view, it concludes that these injuries did not result from Savio's employment or his initial injury. I disagree. Savio's alleged injuries stem from the original injury to his ankle. Simply stated, but for his ankle injury, none of the subsequent events would have occurred, and therefore all of his newly acquired injuries emanate from his employment and the injury.

The majority also holds that Savio's asserted claims must be decided in courts of law because the Act provides no remedy for his alleged injuries. While acknowledging that insurance carriers can lose their authority to do a compensation business in this state and be subject to fines if they knowingly or willfully violate any of the provisions of the Act, the majority holds that this is insufficient and inadequate because it does not provide any direct remedy to Savio.

This conclusion of the majority points up my underlying disagreement with its opinion. The legislature has established penalties and punishments for insurance carriers who violate the Act. Not satisfied with the legislative resolution of this issue, the majority has decided to legislate and create a new remedy—a remedy outside the Act

which is to be found in litigation in the courts.

In light of my opinion that the court has inappropriately authorized a claim for relief outside the Act, little benefit will be derived from further lengthy explication of my views. Suffice it to say that, if the legislature is satisfied with the result reached by the majority, nothing further need be done. If dissatisfied, the Act can be appropriately revised by the legislature. Majority op. at 1271 n. 17. *See Padilla v. Industrial Commission of Colorado*, 696 P.2d 273 (Colo.1985) (Rovira, J., dissenting).

While I disagree with the majority's resolution of the underlying issue, I agree that if a common law action for bad faith is permitted such tort requires proof of unreasonable conduct and knowledge that the conduct is unreasonable or a reckless disregard of the fact that the conduct is unreasonable.

Accordingly, I respectfully dissent.

NEIGHBORS, Justice, concurring in part and dissenting in part:

I concur with the court's opinion except insofar as it sets forth a two-part test for measuring the duty of care owed by an insurer to a "first-party" insured (Part III of the opinion).

We held in *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138 (Colo.1984), that insurers owe an insured a duty of reasonable care (a negligence standard) when defending claims made by third parties against the insured. When required by the insurance contract to defend such claims, the insurer can be liable for damage caused to the insured by the insurer's negligence in investigating, defending, and settling a third-party claim.

In my view, the facts in this case (a first-party claim) are not materially distinguishable from those in *Trimble* (a third-party claim), and I would apply the *Trimble* reasonableness standard to Savio's claim of insurer misconduct. The reason set forth for using a higher standard of insurer conduct in the third-party context

(*Trimble*) is that the insured in those cases has surrendered his right to the insurer to investigate and defend third-party claims, while in the present case the insured retains the full ability to negotiate his claim against insurer and litigate the claim if necessary.

This distinction is unimportant. In both situations the insured can at any time negotiate with the insurer or resort to litigation when the insured believes that the insurer has acted unreasonably in dealing with either first or third-party claims. In this case and the *Trimble* case, the insured asserted claims of insurer misconduct against the *insurer*. The fact that the insured has surrendered rights to defend against third parties in the *Trimble* situation is not, in my mind, a relevant distinction when both involve claims of insurer misconduct (and not conduct of third parties).

It has long been recognized that an insurer owes a duty of good faith and fair dealing to its insured. The insurance contract gives rise to the duty when the insured pays a premium to obtain financial security against calamity and peace-of-mind rather than a commercial advantage. *Trimble*, 691 P.2d at 1141. In view of this quasi-fiduciary relationship, insurers should be held to the same standard of reasonable conduct when the "underlying claim" is by a third party or by the insured himself. In my view, the *Trimble* negligence test should be applied to Savio's claim.

I would affirm the judgment of the court of appeals and would direct that the case be remanded to the district court for reinstatement of Savio's claim.